IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 05–cv–01563–EWN–BNB

*(Consolidated with <u>Baird v. Red Robin Gourmet Burgers, Inc.</u>, 05-cv-01903; and consolidated for pretrial proceedings with <u>Wilster v. Snyder</u>, 05-cv-01707)*

ANDRÉ ANDROPOLIS, On Behalf of
Himself and All Others Similarly Situated,

      Plaintiff,

v.

RED ROBIN GOURMET BURGERS, INC.,
MICHAEL J. SNYDER,
JAMES P. McCLOSKEY,
Lisa A Dahl,
Katherine L. Scherping, and
Dennis B. Mullen

      Defendants.

---

## ORDER AND MEMORANDUM OF DECISION

---

    This is a class action securities fraud case.  Lead Plaintiff, the City of Philadelphia Board of Pensions and Retirement ("Plaintiff"), alleges that Defendants Red Robin Gourmet Burgers, Inc. (hereinafter "Red Robin" or the "Company"), Michael J. Snyder, James P. McCloskey, Lisa A. Dahl, Katherine L. Scherping, and Dennis B. Mullen (collectively "Defendants") violated the Securities Act of 1934, 15 U.S.C. § 78a, *et seq.* (2006) (hereinafter the "1934 Act"), by

1

knowingly or recklessly making material misstatements or omissions, on which investors from

Plaintiff's class reasonably relied, and which resulted in significant economic losses by investors.

Specifically, Plaintiff asserts: (1) Defendants violated Section 10(b) of the 1934 Act, 15 U.S.C. §

78j(b) (2006) (hereinafter "Section 10(b)"), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (2006)

(hereinafter "Rule 10b–5"), by making material misstatements and omissions regarding Red

Robin's operational and financial health; (2) Red Robin, McCloskey, Mullen, and Dahl violated

Section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a) (2006) (hereinafter "Section 14(a)"), and

Rules 14a–3 and 14a–9, 17 C.F.R. §§ 240.14a–3, 240.14a–9 (2006), by making material

omissions in the Company's proxy statement; and (3) Snyder, McCloskey, Dahl, Scherping, and

Mullen (collectively "Individual Defendants") violated Section 20(a) of the 1934 Act, 15 U.S.C. §

78t(a) (2006) (hereinafter "Section 20(a)"), by exercising their authority to cause Red Robin

employees to engage in securities violations.  This matter is before the court on: (1) "Motion to

Dismiss on Behalf of Defendants Red Robin Gourmet Burgers, Inc., Lisa A. Dahl, Katherine L.

Scherping, and Dennis B. Mullen," filed May 1, 2006; (2) "Defendant James P. McCloskey's

Motion to Dismiss Consolidated Complaint," filed May 1, 2006; and (3) "Defendant Michael J.

Snyder's Memorandum of Law in Support of His Motion to Dismiss," filed May 1, 2006.

Jurisdiction is premised upon 28 U.S.C. § 1331 (2006).

## FACTS

### 1.    *Factual Background*

Most of the following facts are taken from Plaintiff's Consolidated Complaint.  (*See*

Consolid. Compl. ¶ 2 [filed Feb. 28, 2006] [hereinafter "Consolid. Compl."].)  I also consider

documents central to Plaintiff's claims that are incorporated by reference or partially quoted in the Consolidated Complaint. *GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997).

This is a securities class action on behalf of all persons who purchased the common stock of Red Robin between August 13, 2004 and January 9, 2006 ("the Class Period"). (Consolid. Compl. ¶ 2.) Plaintiff purchased shares of Red Robin common stock during the Class Period and held the stock through at least January 10, 2006. (*Id.* ¶ 26.)

### a.    The Defendants

Red Robin is a Delaware corporation with its headquarters in Greenwood Village, Colorado. (*Id.* ¶ 27.) Red Robin became a publicly traded company in July 2002, and its common stock is listed on the NASDAQ National Market under the symbol RRGB. (*Id.* ¶¶ 4, 27.) Red Robin is a causal dining restaurant chain that operates company-owned restaurants and sells franchises from which the Company receives royalties. (*Id.* ¶ 27.) As of December 25, 2005, there were two hundred ninety-nine Red Robin restaurants in thirty-three states and two Canadian provinces. (*Id.*)

Snyder, who had previously been Red Robin's President, Chief Operating Officer, and Director, was elected as Chief Executive Officer ("CEO") in March 1997 and Chairman of Red Robin's Board of Directors ("the Board") in May 2000. (*Id.* ¶ 28.) He retired from this post on August 10, 2005 and remains a consultant to the Company. (*Id.*) McCloskey served as Red Robin's Chief Financial Officer ("CFO") from June 1996 until June 20, 2005. (*Id.* ¶ 29.) McCloskey served as an Executive Vice President until his resignation on August 10, 2005. (*Id.*)

Scherping was hired to replace McCloskey as CFO in June 2005. (*Id.* ¶ 32.) Dahl served as Red Robin's Controller from 1997 and Vice President from 2003 until she was terminated during the second quarter of 2005. (*Id.* ¶¶ 30, 132.) Mullen was a member of the Board's Audit Committee and replaced Snyder as Chairman in August 2005. (*Id.* ¶ 31.)

### b.    *Background*

During Snyder's tenure with Red Robin, he transformed the Company into a profitable, fast-growing restaurant chain. (*Id.* ¶ 3.) Between the Company's July 2002 initial public offering and early August 2005, the value of Red Robin's stock price increased five-fold, and from 2003 through 2005, Red Robin added forty-eight company-owned restaurants and supported the opening of thirty-three franchised restaurants. (*Id.* ¶¶ 4–5.)

Red Robin's Code of Ethics, adopted during the Class Period, expressly prohibited all employees—senior officers and executives included—from using Red Robin's property for personal benefit or other improper uses. (*Id.* ¶ 41.) Further, the Code limited employees to spending Company funds for Company business and required that Red Robin receive fair value in property and services in exchange for its funds. (*Id.*) Also during the Class Period, Red Robin's travel and entertainment expense reimbursement policy required that: (1) employees be reimbursed only for business-related expenses set forth on an expense report and supported with a receipt; (2) for business-related air travel expenses, employees were to submit ticket stubs as well as receipts; (3) credit card statements did not satisfy the receipt requirement; and (4) managers' and officers' expense reports were to be approved by a senior manager or officer. (*Id.* ¶ 42.)

4

Snyder's May 11, 2002 Employment Agreement required that he comply with Company expense reimbursement procedures.  (*Id.* ¶ 49.)

    *c.*    ***Confidential Witness Reports***

    A former Red Robin staff accountant who worked at the Company's headquarters from 2004 to 2005 (hereinafter "CW2") saw "abuse of travel and entertainment expenses from Red Robin's officers" and claims the "reimbursement system was a joke." (*Id.* ¶¶ 1, 43.)  A former Red Robin senior executive at the Company's headquarters prior to the Class Period (hereinafter "CW4"), states "the worst abuser was [Snyder] who would charge virtually everything, including personal expenses, to his Red Robin Corporate American Express card and approve non-business related charges of other senior executives." (*Id.*)  Further, according to both CW2 and a confidential witness who was a Red Robin staff accountant at the Company's headquarters prior to the Class Period (hereinafter "CW1"), it was common knowledge in the accounting department that Snyder would only rarely submit an expense report. (*Id.*)  In 2000, according to a former Red Robin senior officer who worked at the Company's headquarters prior to the Class Period (hereinafter "CW3"), Red Robin's accountants discovered Snyder regularly paid for his and family members' personal expenses, including travel on private jets, with corporate funds. (*Id.* ¶ 45.)

    CW3 claims Snyder sought to have Red Robin pay for his purchase of a $15,000 Rolex watch for fellow Red Robin officer, Bob Merullo. (*Id.* ¶ 18.)  The Company's Assistant Controller, however, directed that the $15,000 be booked as additional compensation for Merullo. (*Id.*)  Snyder, in turn, increased Merullo's compensation to cover all income taxes he would incur as a result of the Rolex. (*Id.*)  CW2 claims Nancy Cornell, Snyder's secretary during the Class

Period, would regularly approved payment of Snyder's American Express bill and then directed the accounts payable specialist to pay the bill in its entirety.  (*Id.*)  With respect to Snyder's use of Red Robin's chartered jet, CW1 received invoices related to Snyder's travel, which she was directed by her superiors to pay.  (*Id.* ¶ 44.)  According to CW1, Snyder would never submitted an expense report that corresponded to the invoiced trips, and the invoices submitted by Snyder were uninformative as to passengers and destinations, preventing anyone from confirming whether the jet was used for business purposes.  (*Id.*)  CW3 and CW4 allege Snyder was confronted about his travel expense abuses.  (*Id.*)

CW4 reports that the misappropriation of Red Robin funds extended to other officers, including Merullo, Red Robin's Senior Vice President of Restaurant Operations, and Michael Woods, Red Robin's Senior Vice President of Franchise Development.  (*Id.* ¶ 50.)  For instance, according to CW4, Merullo, Woods, Snyder, and their families would charge dinner to Red Robin at least twice a week at an upscale steakhouse.  (*Id.*)  Further, "[w]hen those three traveled, sometimes on business, sometimes not, they would use the private jet, stay at the finest hotels, eat at the finest restaurants, and rent the most expensive cars, all of which was paid for by Red Robin."  (*Id.*)

According to CW2, then Vice President of Restaurant Operations, Eric Houseman, also submitted expense reports with just his Red Robin Corporate American Express bill; yet, Houseman's expense report was always approved for payment by another officer.  (*Id.* ¶ 51.)  CW1 and CW2 state that there were numerous charges for golf and country club memberships on expense reports from lower level management as well, and, as a result of non-enforcement of the

Company's travel and entertainment expense policies, some employees would "double dip" by submitting expense reports seeking reimbursement for expenses that had already been paid directly by Red Robin.  (*Id.* ¶¶ 51–52.)  Further, CW1 states that some officers submitted approved expense reports containing items that appeared to have been personal in nature but which were coded as being charitable donations.  (*Id.*)

CW1 and CW2 both claim they voiced concerns about, among other things, Company payment for officers' personal expenses, insufficient expense report documentation, and double-dipping to: (1) Patty Leon, Accounts Payable Supervisor; (2) Heather Slonka, Accounting Manager; and (3) Doug Pierce, Assistant Controller, each of whom reported to Dahl, who in turn reported to McCloskey.  (*Id.* ¶ 54.)  Normally, the supervisors took no action to address these concerns.  (*Id.*)  Occasionally, CW1 and CW2 went directly to Dahl to discuss inadequate support for expense reimbursement requests, but Dahl ultimately approved for payment most deficient reimbursement requests.  (*Id.*)  CW2 said that when a supervisor did reject an expense reimbursement request, Dahl almost always would instruct that, so long as an officer or senior manager had approved it, the purported expense should be paid.  (*Id.*)  Further, according to CW1, CW2, and a former accounts payable specialist who worked at Red Robin's headquarters from 2004 until 2005 (hereinafter "CW5"), Red Robin's accounting department was severely understaffed, resulting in staff accountants having workloads that prevented them from properly performing their jobs prior to and throughout the Class Period.  (*Id.* ¶¶ 1, 78.)

In the Summer of 2003, Red Robin distributed a memo outlining its travel and expense reimbursement policies, and each employee had to acknowledge with a signature having received

and reviewed the guidelines.  (*Id.* ¶ 55.)  CW2 claims this memo was initiated because of

widespread lack of compliance with the policies; CW1 reports the same improper conduct

continued after distribution of the memo.  (*Id.*)

> ### d.      August 13, 2004 to May 24, 2005

Red Robin's Form 10–Q for the second quarter of 2004, which was signed by McCloskey

and filed with the Securities and Exchange Commission ("SEC") on August 13, 2004, made the

following representation concerning Red Robin's internal controls:[1]

> As of the end of the period covered by this report, we preformed an evaluation
> under the supervision and with participation of our management, including the
> [CEO] and [CFO], of the effectiveness of our disclosure controls and procedures.
> Based upon that evaluation, our management, including the [CEO] and [CFO],
> concluded that our disclosure controls and procedures were effective as of the end
> of the period covered by the report.
>
> No change in our internal control over financial reporting occurred during our last
> fiscal quarter that has materially affected, or is reasonably likely to materially
> affect, our internal control over financial reporting.

(*Id.* ¶ 119.)  Further, Snyder and McCloskey certified, in accordance with Rule 13a–14 of the

1934 Act, that they had reviewed the report and determined that, based on their knowledge: (1)

the report did not contain false material statements or omit material facts, and "fairly present[ed]

in all material respects the financial condition" of the Company; and (2) Red Robin had

established and maintained appropriate and effective disclosure and control methods, and had

disclosed any significant deficiencies of and fraud concerning internal controls.  (*Id.*)  On August

---

[1]Form 10–Q is the form used to file quarterly reports with the SEC as required by either
section 13 or 15(d) of the 1934 Act.  15 U.S.C. §§ 78m, 78o(d) (2006).

13, 2005, the price of Red Robin's common stock increased approximately nine percent. (*Id.* ¶ 120.) McCloskey and Snyder made substantially similar representations in the third quarter of 2004 and 2005. (*Id.* ¶¶ 122–24, 144.)

In early 2005, Red Robin publicly acknowledged that deficient internal controls had led to improper lease accounting that made earnings appear higher than they actually were, forcing the Company to restate its financial results for fiscal years 2002 and 2003. (*Id.* ¶¶ 7, 86–90.)

On April 22, 2005, Red Robin filed its Definitive Proxy Statement with the SEC. (*Id.* ¶ 126.) The proxy summarized Snyder's compensation for 2002 through 2004 and did not list any perquisites, footnoting that "[i]n accordance with the rules of the SEC, the compensation described . . . does not include . . . perquisites and other personal benefits received by any named executive officer that in the aggregated do not exceed in any fiscal year . . . $50,000." (*Id.*) For each year from 2003 to 2005, Snyder would have had to sign annual director and officer questionnaires used to prepare Red Robin's proxy statements. (*Id.* ¶ 157.) According to the 2005 proxy, Snyder was Red Robin's second largest shareholder, owning 9.5 percent, or 1,535,802, of the shares outstanding; McCloskey and Mullen owned 137,266 shares and 9,000 shares respectively. (*Id.* ¶ 161.)

### e.    *May 25, 2005 to November 2, 2005*

On May 25, 2005, *The Wall Street Journal* published an article discussing corporate executives that bill shareholders for their personal use of corporate jets and those companies that conceal such abuse. (*Id.* ¶ 56.) That same day, McCloskey sold ten thousand shares of Red Robin stock at approximately fifty-five dollars per share, and Snyder entered into two pre-paid

variable share forward contracts through which he was paid a total of $14,086,341 in exchange for agreeing to deliver 150,000 shares on November 17, 2006 and another 150,000 shares on May 25, 2007.  (*Id.* ¶ 58.)

After members of the Board read this article, the Board decided to examine whether Red Robin was properly accounting for officers' use of the Company's chartered jet.  (*Id.* ¶ 57.)  On June 22, 2005, Red Robin announced Sherping's replacement of McCloskey as CFO.  (*Id.* ¶ 62.)  In July 2005, Red Robin hired counsel to investigate Snyder's undocumented expenses.  (*Id.* ¶ 59.)  Counsel presented its conclusions to the Board on August 8, 2005.  (*Id.*)  On August 9 and 10 of 2005, the Board met and ultimately decided Snyder and McCloskey should retire.  (*Id.*)  On August 10, 2005, Snyder entered into a retirement agreement which provided he would: (1) immediately resign as an executive; and (2) reimburse Red Robin for any unauthorized expenses.  (*Id.* ¶¶ 59–60.)  Likewise, on August 10, 2005, McCloskey entered into a resignation agreement with Red Robin.  (*Id.* ¶ 61.)

On August 11, 2005, Red Robin disclosed through a press release that: (1) an internal investigation initiated by the Board had uncovered that Snyder had been diverting corporate and shareholder assets to pay for personal travel and non-business related expenses; (2) the Company believed the improper expenses were not material to the Company's financial position or results of operations; (3) Red Robin had notified the SEC of its internal investigation; (4) Snyder and McCloskey had resigned; (5) Snyder would reimburse the Company for improperly documented expenses; (6) Mullen would take over as Chairman and CEO; and (7) Houseman would take over as President and Chief Operating Officer.  (*Id.* ¶¶ 9, 62; Mot. to Dismiss on Behalf of Defs. Red

Robin Gourmet Burgers, Inc., Lisa A. Dahl, Katherine L. Scherping, and Dennis B. Mullen, Ex. 3 [8/11/05 Press Release] [filed May 1, 2006] [hereinafter "Red Robin Br."].)  On August 12, 2005, Red Robin's common stock plummeted twenty-four percent.  (*Id.* ¶ 10.)  On August 15, 2005, the Bear Stearns Report conveyed that Red Robin's accounting department, led by McCloskey and Dahl, had been improperly calculating the dollar value of the unauthorized employee usage of Red Robin's charted jet for personal travel, by using the IRS accounting method rather than the SEC method.  (*Id.* ¶ 65.)

In its Form 10–Q for the second quarter of 2005, filed with the SEC on August 19, 2005, Red Robin acknowledged that internal control deficiencies enabled: (1) non-compliance by Snyder and McCloskey with company reimbursement policies; (2) unauthorized use of the company jet; and (3) unauthorized charitable donations of Company funds and services by Snyder.  (*Id.* ¶¶ 67, 119.)  The Form 10–Q also noted the following specific corporate deficiencies: (1) lack of clear procedures for ensuring appropriate dissemination of the non-commercial aircraft usage policy; (2) inadequate supervisory oversight of accounting personnel; (3) inadequate reporting and disclosure controls regarding the identification of senior executive fringe benefit compensation; and (4) lack of a charitable donations policy.  (*Id.* ¶ 30.)  Red Robin also disclosed that Snyder had entered into a restitution agreement with the Company to repay $1.25 million for inadequately documented expenses, resulting in a gain of $0.05 per share after tax during the third quarter of 2005, and that Dahl had been terminated.  (*Id.* ¶ 68.)  On February 1, 2006, Red Robin was notified by the SEC that the agency had launched a formal investigation of the Company.  (*Id.* ¶ 76.)

#### f.        November 3, 2005 to February 16, 2005

On November 3, 2005, Red Robin issued a press release announcing that it had met its third quarter earnings guidance for revenue and exceeded the guidance for income.  (*Id.* ¶ 141.) Further, the Company expected fourth quarter 2005 total revenues of approximately $118 million to $119.5 million and earnings of approximately $0.40 to $0.41 per share, based upon an expected comparable restaurant sales increase of three to four percent, and the opening of eleven new Company-owned restaurants during the quarter.  (*Id.* ¶ 95.)  The press release included a caveat regarding the document's "forward looking statements," explaining, "These statements involve risks and uncertainties that could cause actual results to differ materially from those described in the statements."  (Red Robin Br., Ex. 6 [11/3/2005 Press Release].)  Red Robin went on to identify several such risks and uncertainties, including: "our ability to achieve and manage our planned expansion; our ability to raise capital in the future; the ability of our franchisees to open and manage new restaurants; . . . the assimilation of our new [CEO] and [CFO], and the continued service of key management personnel; . . . [and] the effectiveness of our internal controls over financial reporting."  (*Id.*)  On November 4, 2005, shares of Red Robin common stock increased ten percent.  (*Id.* ¶ 97.)

On November 17, 2005, Red Robin filed a Form 8–K with the SEC stating that the Company was still in the process of remediating previously disclosed deficiencies and retaining an audit service provider to implement the Company's internal audit function.[2]  (*Id.* ¶ 79.)

---

[2]A Form 8–K is a used to disclose a material event to the SEC in a timely manner.  *See* 15 U.S.C. § 78m(a) (2006).

12

According to Red Robin's Charter, its Audit Committee maintained responsibility for: (1)

reviewing the Company's accounting principles; (2) reviewing the Company's internal and

external accounting and financial controls; and (3) monitoring the Company's compliance with the

Code of Ethics.  (*Id.* ¶ 80.)  As of April 22, 2005, the Audit Committee was comprised of

Benjamin Graebel (Chairman of the Committee), Edward Harvey, and Denny Mullen.  (*Id.* ¶ 81.)

On May 11, 2005, Red Robin announced Harvey's intention to resign from the Board effective as

of the August 2005 board meeting.  (*Id.* ¶ 82.)  On August 11, 2005, Mullen left the Audit

Committee and replaced Snyder as Chairman and CEO.  (*Id.* ¶ 83.)  On September 6, 2005, the

Board appointed two new outside directors to the Audit Committee: Richard Howell and Taylor

Simonton.  (*Id.* ¶ 84.)  At some point between April and November 2005, Graebel left the Audit

Committee and was replaced as Chairman by Simonton, who was then replaced by Harvey on

November 17, 2005.  Red Robin never disclosed Graebel's replacement.  (*Id.* ¶ 133.)

In its Form 10–Q for the second quarter of 2005, Red Robin acknowledged that it had

been improperly accounting for costs relating to complimentary employee meals, which resulted in

inflation of reported revenues.  (*Id.* ¶ 92.)  Once the accounting error was corrected, restaurant

revenues for the first and second quarters of 2005 decreased by $3.5 million, or 1.4 percent, and

restaurant labor costs and general and administrative costs decreased by $3.4 million and

$141,100 respectively.  (*Id.*)  Still, according to Red Robin's September 14, 2005 press release,

the Company expected revenues of approximately $487 to $491 million and net income of $1.69

to $1.72 per dilute share for the full-year 2005, based upon an expected comparable restaurant

sales increase of four to five percent.  (*Id.* ¶ 139.)  CW1 and CW2 assert Red Robin had no

system in place to prevent non-employees from obtaining complimentary food and beverages through employee meal cards and the employee free meal and discount policy.  (*Id.* ¶¶ 91, 136.)

On January 10, 2006, Red Robin announced through a press release that its fourth quarter earnings guidance issued in November of 2005 was too high and that actual results were now expected to be at least twenty percent lower than predicted.  (*Id.* ¶ 98.)  In an investor conference call that same day, Mullen admitted that the extent of the miscalculation was more than he would have expected from a modest sales surprise, but said he did not yet know the reason for the miscalculation.  (*Id.*)  Still, Mullen explained, "as soon as we knew the magnitude of the miss we wanted to go public with it.  As we have said, we now have to do more analysis, detailed analysis, and we will certainly share all that with you on the February call."  (*Id.*)  On January 10, 2006, the value of Red Robin's common stock sunk from $51.98 to $38.29.  (*Id.* ¶ 100.)

On February 16, 2006, Red Robin held an investor conference call to discuss fourth quarter 2005 financial results, during which the Company reported net income of $0.33 per diluted share and revenue of $116.5 million.  (*Id.* ¶ 101.)  During the call, Scherping attributed $0.03 of the fourth quarter 2005 earnings guidance miscalculation to workers' compensation insurance expenses, for which Red Robin was under-reserved.  (*Id.* ¶ 104.)  In financial statements filed during the Class Period, Red Robin assured investors that it closely monitored workers' compensation liabilities and would adjust its reserve to cover such liabilities when warranted.  (*Id.* ¶ 103.)  Scherping attributed $0.02 of the disparity to higher than expected supplies and utilities expenses.  (*Id.* ¶ 108.)  Scherping admitted that, contrary to the Company's stated accounting policy, Red Robin recognized supplies expenses as the supplies were purchased and put into

14

inventory rather than when they were actually used.  (*Id.* ¶¶ 107–08.)  Further, Scherping blamed higher supplies and utilities expenses on the increase in oil and energy prices, which were widely reported in August and September 2005.  (*Id.* ¶ 112.)  A former member of Red Robin's accounting staff (hereinafter "CW6") said the Company never audited or took a physical inventory of its California warehouse, which stored supplies for restaurants.  (*Id.* ¶¶ 1, 110, 136.) Consequently, the warehouse was always understocked, leading to at times sharp increases in supply purchases to refill the warehouse.  (*Id.*)

Scherping attributed half of the fourth quarter earnings guidance miscalculation to restaurants that were open less than five reporting periods.  (*Id.* ¶ 113.)  She explained that Red Robin's historical experience had been that restaurants in the first year of operation in new markets averaged approximately ten percent less in sales volume than restaurants that had been open more than five reporting periods (called "comp units"), and new restaurants in existing markets averaged approximately five percent less in sales volume than the average volume for comp units.  (*Id.* ¶ 114.)  Scherping admitted that the Company's fourth quarter sales forecast for new restaurants in new markets was overly aggressive, explaining that the Company decided to go with the sales volume only five percent lower than the average volume for comp units based on an optimistic view reflecting the occurrence of the previous three quarters of the year, which was weighted to the existing markets and ran closer to ninety-five percent.  (*Id.* ¶ 116.)  Finally, Scherping acknowledged that Red Robin failed to factor in lower sales volume for new restaurants opened in "greenfield areas"—areas where a restaurant opened before development of an adjacent shopping center was complete.  (*Id.* ¶¶ 117–18.)

15

## 2.      *Procedural History*

On August 15, 2005, Andre Andropolis filed a federal securities class action against

Defendants Red Robin, Snyder, and McCloskey asserting they violated Section 10(b), Rule 10b–5

and Section 20(a) of the 1934 Act.  (Pl.'s Compl. for Violation of the Fed. Securities Laws and

Demand for Jury Trial [filed Aug. 15, 2005].)  On December 19, 2005, Magistrate Judge Boland

issued an order: (1) granting Plaintiff, City of Philadelphia Board of Pensions and Retirement's,

motion for appointment as Lead Plaintiff; and (2) consolidating three cases pending against

Defendants that were based on the same allegations.  (Order [filed Dec. 19, 2005].)  The three

cases included two securities fraud class actions, *Andropolis v. Red Robin Gourmet Burgers, Inc.*,

05–cv–01563–EWN–BNB and *Baird v. Red Robin Gourmet Burgers, Inc.*, 05–cv–01903–LTB,

and one shareholder derivative suit, *Wilster v. Snyder*, 05–cv–01707–PSF–BNB.[3]  (*Id.*)  On

February 28, 2006, Plaintiff filed its Consolidated Complaint, wherein Plaintiff asserts: (1) all

defendants violated Section 10(b) and Rule 10b–5 by making material misstatements and

omissions regarding Red Robin's financial health; (2) Defendants Red Robin, McCloskey, Mullen,

and Dahl violated Section 14(a) and Rule 14a–3 and 14a–9 by making material omissions in the

Company's proxy statement; and (3) Individual Defendants violated Section 20(a) by exercising

their authority to cause Red Robin employees to engage in improper conduct or by failing to

_____

[3]On August 3, 2006, this court dismissed all claims contained in the amended shareholder
derivative complaint against all defendants because Plaintiff Elliot Wilster failed to allege
particularized facts to show that a majority of the Board lacked independence or interest in certain
challenged transactions and activity such that a pre-litigation demand on the Board was futile.
(Order [filed Aug. 3, 2006].)

exercise their authority to prevent Red Robin employees from engaging in improper conduct.

(Consolid. Compl. ¶¶ 174–91.)

On May 1, 2006, Red Robin, Dahl, Scherping, and Mullen filed a motion to dismiss

arguing: (1) Plaintiff's allegations concerning the pre-August 11, 2005 time period fail to state a

claim for securities fraud because (a) alleged mismanagement is not actionable as securities fraud,

(b) Plaintiff fails to plead the fraud with particularity, and (c) Plaintiff fails to establish a strong

inference of scienter; (2) Plaintiff's allegations concerning the post-August 11, 2005 time period

cannot support a claim for securities fraud because (a) Plaintiff lacks standing to assert claims

based on statements made after it purchased Red Robin stock, and (b) Red Robin's earnings

forecasts are protected by the bespeaks caution doctrine as well as the safe harbor provision of the

Private Securities Litigation Reform Act, 15 U.S.C. §§ 78u–4 to 78u–5 (2006) (hereinafter

"PSLRA").  (Red Robin Br.)  Also on May 1, 2006, Snyder filed a motion to dismiss, arguing

Plaintiff fails to plead sufficient facts to: (1) establish a strong inference of scienter; (2) show that

Snyder made false statements of material fact; and (3) allege a predicate violation of the 1934 Act.

(Def. Michael J. Snyder's Memo. of Law in Supp. of His Mot. to Dismiss. [filed May 1, 2006].)

Also on May 1, 2006, McCloskey filed a motion to dismiss arguing Plaintiff: (1) fails to establish

a strong inference of scienter; (2) cannot plead loss causation; and (3) fails to establish control

person liability.  (Def. James P. McCloskey's Mot. to Dismiss the Consolid. Compl. [filed May 1,

2006].)  On May 31, 2006, Plaintiff filed a response to all three motions to dismiss.  (Lead Pl.'s

Memo. of Law in Opp. to Defs.' Mots. to Dismiss the Consolid. Compl. [filed May 31, 2006]

[hereinafter "Pl.'s Resp."].)  On June 19, 2006, Defendants replied in support of their motions.

17

(Reply in Supp. of Mot. to Dismiss on Behalf of Defs. Red Robin Gourmet Burgers, Inc., Lisa A.

Dahl, Katherine L. Scherping, and Dennis B. Mullen [filed June 19, 2006] [hereinafter "Red

Robin Reply"]; Def. Michael J. Snyder's Reply in Supp. of his Mot. to Dismiss [filed June 19,

2006]; Def. James McCloskey's Reply in Supp. of his Mot. to Dismiss the Consolid. Compl. [filed

June 19, 2006].)  This matter is fully briefed and ripe for review.

## ANALYSIS

### 1.  *Legal Standard*

#### a.  *Motion to Dismiss*

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a

claim for "failure to state a claim upon which relief may be granted."  Fed. R. Civ. P. 12(b)(6)

(2006).  For the purposes of a Rule 12(b)(6) motion, a court should only dismiss the claim "'when

it appears that the plaintiff can prove no set of facts in support of the claims that would entitle him

to relief, accepting the well-pleaded allegations of the complaint as true and construing them in

the light most favorable to the plaintiff.'"  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th

Cir. 2003) (quoting *Yoder v. Honeywell, Inc.*, 104 F.3d 1215, 1224 [10th Cir. 1997]).  "'The

court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties

might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to

state a claim for which relief may be granted.'"  *Id.* (quoting *Sutton v. Utah State Sch. for the

Deaf & Blind*, 173 F.3d 1226, 1236 [10th Cir. 1999]).

Although the fact-specific inquiries common to securities cases generally preclude

dismissal, a court will nonetheless "not hesitate to dismiss securities claims . . . where the alleged

misstatements or omissions are plainly immaterial, or where the plaintiff has failed to allege with particularity circumstances that could justify an inference of fraud under Rule 9(b)" or the PSLRA. *See Grossman v. Novel, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997).

        **b.**     ***Pleading Requirements Under the PSLRA***

Because Rule 10b–5 claims involve allegations of fraudulent conduct, courts have long required that they be pled in accordance with Rule 9(b) of the Federal Rules of Civil Procedure, which requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b) (2006); *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1258 (10th Cir. 2001). Skeptical of Rule 9(b)'s ability to curtail perceived abuses of the 1934 Act by overzealous plaintiffs' attorneys, Congress enacted the PSLRA in 1995. *Fleming*, 264 F.3d at 1258. Among other things, the PSLRA substantially modified the standards for pleading securities fraud claims, purportedly establishing standards that were "higher than any federal court had imposed up to that point in time." *Id.* at 1259. Under the PSLRA, to plead a valid 10b–5 claim, a plaintiff must: (1) plead with particularity the facts surrounding the alleged fraud, including identifying the specific misleading statements or omissions and the reasons why they are misleading; and (2) plead with particularity the facts permitting a strong inference of scienter. 15 U.S.C. §§ 78u–4(b)(1)–(2) (2006). Thus, the PSLRA mandates a more stringent pleading standard for both materiality and scienter in securities fraud actions. *Adams*, 340 F.3d at 1095–96; *see Fleming*, 246 F.3d at 1258.

**2.**     *Evaluation of Claims*[4]

    **a.**     **Preliminary Matters**

        **i.**     **Standing**

As a preliminary matter, Red Robin argues that because Plaintiff fails to allege that it bought Company stock after August 11, 2005, Plaintiff lacks standing to assert claims based on Red Robin's statements or omissions after that date.  (Red Robin Br. at 30–31.)  Although Plaintiff does not allege in its Consolidated Complaint the specific dates on which it purchased Red Robin stocks, Plaintiff does state that it "purchased shares of Red Robin stock during the Class Period."  (Consolid. Comp. ¶ 26.)  Construing Plaintiff's allegations in their most favorable light, I find it implicit in Plaintiff's allegations that it purchased stocks at all *relevant* times during

---

[4]During my discussion of Plaintiff's claims under Section 10(b) and 14(a) of the 1934 Act, I refer to Red Robin as the sole defendant, and do not directly address the claims regarding Individual Defendants.  I do so based on the well-established principle that "a corporation is chargeable with knowledge of its agents and employees acting within the scope of their authority."  *W. Diversified Servs. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1276 (10th Cir. 2005).  Arguably, Snyder and McCloskey engaged in activities outside the scope of their authority.  (*See* Consolid. Compl. ¶¶ 40–61.)  Nonetheless, for the purposes of this motion, I will presume they acted within the scope of such authority and that Red Robin is, therefore, chargeable with the knowledge of Individual Defendants as alleged in the Consolidated Complaint.  Because, as will be seen, I find Plaintiff fails to allege sufficient facts to support any of its claims against Red Robin, even considering the collective imputed knowledge of all Defendants, it is unnecessary to separately address the claims against Individual Defendants.

the Class Period.[5]  *See Dubbs*, 366 F.3d at 1201.  Thus, I find Plaintiff has standing to assert

claims regarding Red Robin's statements or omissions during the entire Class Period.

> ### ii.    Safe Harbor and Bespeaks Caution

The bespeaks caution doctrine is a judicially created doctrine providing that "[f]orward-

looking representations are . . . immaterial when the defendant has provided the investing public

with sufficiently specific risk disclosures or other cautionary statements concerning the subject

matter of the statement at issue to nullify any potentially misleading effect."  *Grossman*, 120 F.3d

at 1120.  Such forward-looking statements may, however, be material "if the opinion is known by

the speaker at the time it is expressed to be untrue or to have no reasonable basis in fact."[6]  *Id.* at

1120 n.6.

In the PSLRA, Congress created a "safe harbor" for "forward looking statements"

grounded in the bespeaks caution doctrine.  *Helwig v. Vencor, Inc.*, 251 F.3d 540, 547 (6th Cir.

2001).  Under the PSLRA's safe harbor provision, public companies are insulated from liability

for certain forward-looking statements, including "projection of revenues, income (including

income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital

---

[5]Moreover, Plaintiff attaches a schedule of its stock transactions to its response, showing that its last purchase of Red Robin stock was on December 16, 2005.  (Pl.'s Resp., Ex. B [Pl.'s Transaction Sched.].)  Even if Plaintiff's pleadings were not sufficient as written, this court would, if need be, permit Plaintiff to amend its pleadings to conform with the transaction schedule.  *See* Fed. R. Civ. P. 15(a) (2006) (mandating that leave to amend pleadings "shall be freely given when justice so requires").

[6]Contrary to this court's findings, Red Robin asserts, without citation, that actual knowledge of falsity does not preclude protection by the "bespeaks caution" doctrine.  (*See* Red Robin Reply at 29–30.)

structure, or other financial items," if such statements are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c) (2006). "Congress enacted the safe-harbor provision in order to loosen the 'muzzling effect' of potential liability for forward-looking statements, which often kept investors in the dark about what management foresaw for the company." *Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th Cir. 1999) (citing H.R. Conf. Rep. No. 104-369, at 42 [1995], *reprinted in* 1995 U.S.C.C.A.N. 730, 741). However, even such a forward-looking statement is actionable if made with "actual knowledge" that the statement was false or misleading. 15 U.S.C. § 78u–5(c)(1)(B) (2006). While the bespeaks caution doctrine predated the PSLRA and is similar to the statutory safe harbor, the doctrine survived the PSLRA as an independent test of materiality. *See* H.R. Conf. Rep. No. 104–369, at 46 (1995) *reprinted in* 1995 U.S.C.C.A.N. 730, 745.

Plaintiff's Consolidated Complaint alleges that Red Robin's earnings guidance for the fourth quarter of 2005 was materially false and misleading.[7] (*See* Consolid. Compl. ¶¶ 61, 140, 173.) Red Robin argues its earnings forecasts are protected by the PSLRA's safe harbor provision as well as the bespeaks caution doctrine. (Red Robin Br. at 31–33.) Plaintiff counters

---

[7]Plaintiff blithely suggests in its response that Red Robin's earnings guidance and statement of actual results for the *third* quarter of 2005 were also false and misleading. (*See* Pl.'s Resp. at 48.) Yet, this court finds no allegation in the Consolidated Complaint supporting such an inference. (*See* Consolid. Compl.) In fact, a document referenced in the Consolidated Complaint reports that Red Robin actually *met* its earnings guidance for the third quarter of 2005, and Plaintiff makes no factual allegation to the contrary. (*See* Red Robin Br., Ex. 6 [11/3/2005 Press Release].) Thus, I find Plaintiff fails to allege sufficient facts to support a finding that Red Robin's third quarter 2005 results or earnings guidance were false or misleading.

that because Red Robin provided the guidance with actual knowledge of its falsity, its forecasts are not protected.  (Pl.'s Resp. at 41–44, 48–50.)  I find that Red Robin's forward-looking statements are protected under the PSLRA's safe harbor provision and are thus insulated from liability under federal law.  Accordingly, I need not consider application of the bespeaks caution doctrine.

As an initial matter, I will assume for the purposes of this motion that the Company's earnings guidance for the fourth quarter of 2005 was false when made.  Plaintiff does not dispute that Red Robin's earnings guidance contained forward looking statements accompanied by the requisite meaningful cautionary statements.  (*See* Pl.'s Resp. at 41–42.)  The issue before the court, then, is whether Plaintiff alleges sufficient facts to support a finding that Red Robin made its projections with actual knowledge as to their falsity.  In private securities fraud cases, such as this one, in order for a plaintiff to show that a defendant acted with the requisite state of mind, the plaintiff must state with particularity facts giving rise to a strong inference of scienter.  15 U.S.C. § 78u–4(b)(2) (2006); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1186 (10th Cir. 2003) (citing *Fleming*, 264 F.3d at 1257–59).  A strong inference of scienter is "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading."  *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003).  In evaluating the strength of a plaintiff's inference of scienter, a court should consider a "plaintiff's suggested inference in the context of other reasonable inferences that may be drawn," meaning, this court is not limited to considering only inferences that are favorable to Plaintiff.  *Pirraglia*, 339 F.3d at 1187–88.

23

A little massaging of some of Plaintiff's more nascent arguments suggests Plaintiff intends to establish a strong inference that Red Robin actually knew its earnings guidance was false when issued by showing that: (1) Red Robin had motive and opportunity to issue false statements; (2) Red Robin knew that deficient internal controls made the forecasts inaccurate; and (3) Red Robin knew that improper accounting practices made the forecasts inaccurate. (*See* Pl.'s Resp. at 48–50; Consolid. Compl. ¶¶ 9, 10, 18, 22, 62, 72, 78, 93, 96–97, 103–05, 107–11, 112–18, 121.) I address each argument, and the averments that support it, below.

### *(1)     Motive and Opportunity*

Plaintiff relies on the following allegations to support its claim that Red Robin had both motive and opportunity to defraud investors: (1) after its August 2005 disclosure of corporate deficiencies, Red Robins' stock price plummeted and analysts doubted the Company's integrity and credibility; and (2) with the issuance of Red Robin's fourth quarter 2005 earnings guidance, credibility was restored and the Company's stock price increased. (*See* Consolid. Compl. ¶¶ 9, 10, 18, 62, 78, 95–97.)  Plaintiff suggests that because the Company faced "great uncertainty," its new CFO and CEO, "who had a limited history of working together, knowingly provided investors with materially false and misleading earnings and sales forecasts" in order to regain corporate credibility. (*See* Consolid. Compl. ¶¶ 95–97.)  Even presuming that such a motive is sensible, "courts distinguish motives common to corporations and executives generally from motives to commit fraud." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690 (6th Cir. 2004). Clearly, "[a]ll corporate managers share a desire for their companies to appear successful.  That desire does not comprise a motive for fraud." *Id.* (citing *Chill v. GE*, 101 F.3d 263, 268 [2d Cir.

1996] [stating that "such a generalized motive, one which could be imputed to any publicly-owned-for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter"]).  The motive asserted in the instant case—the appearance of success of the Company—is clearly presumed to be common to all Red Robin executives and officers.

Moreover, the inference of scienter in this case is particularly weak given that Plaintiff does not allege inside stock sales intended to take advantage of Red Robin's purportedly intentional inflation of earnings.[8]  (*See* Consolid. Compl.)  It is just such stock sales which courts most often rely upon in finding a strong inference of scienter.  *PR Diamonds*, 364 F.3d at 691; *Helwig*, 251 F.3d at 552; *see also No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003); *Janus v. McCracken (In re Silicon Graphics Sec. Litig.*), 183 F.3d 970, 986 (9th Cir. 1999).  In fact, some "courts have explained that the absence of inside sales dulls allegations of fraudulent motive."  *PR Diamonds*, 364 F.3d at 691 (citing *In re K-tel Int'l Inc. Secs. Litig.*, 300 F.3d 881, 894 [8th Cir. 2002] [finding "evidence that the individual defendants abstained from trading may undercut allegations of motive"]); *Fecht v. N. Telecom Ltd.  (In re N. Telecom Ltd. Sec. Litig.)*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) ("The absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders.").  I find that considering the want of any allegations of insider trading related to

---

[8]Plaintiff's Consolidated Complaint does suggest that Snyder and McCloskey sold stocks in anticipation of the Company's discovery of their abuse of the travel and entertainment expensing system.  (Consolid. Compl. ¶ 58.)  Plaintiff makes no such allegation, however, regarding Red Robin's earnings forecasts.

Red Robins' earnings forecasts, allegations of Red Robins' generalized motive to make the Company appear stable and successful provides no support for an inference of scienter.

### (2)    *Ineffective Internal Controls*

Plaintiff's Consolidated Complaint suggests that Red Robin knew that deficient and ineffective internal controls made its earnings forecasts inaccurate because: (1) the Company admitted its deficiencies in its second quarter 2005 Form 10–Q; and (2) the Company was in the process of creating and implementing remediation plans for its internal control deficiencies. (Consolid. Compl. ¶¶ 22, 67, 72, 78, 121.)  However, as Red Robin points out, it is difficult to conceive of how Plaintiff can rely upon the Company's public disclosures of corporate deficiencies to support its allegation that Red Robin intentionally misled the public.  (*See* Def.'s Reply at 30.)  "If anything," the fact that Red Robin hired a consultant to examine its expensing systems "counters an inference that the [Company was] was trying to keep the alleged accounting problems from view."  *PR Diamonds*, 364 F.3d at 691.

Plaintiff successfully alleges that when Red Robin made its fourth quarter 2005 earnings forecast, the Company knew of the following corporate deficiencies: (1) lack of clear procedures for ensuring appropriate dissemination of the non-commercial aircraft usage policy; (2) inadequate supervisory oversight of accounting personnel; (3) inadequate reporting and disclosure controls regarding the identification of senior executive fringe benefit compensation; and (4) lack of a charitable donations policy.  (Consolid. Compl. ¶ 30.)  Yet, nowhere does Plaintiff allege that it was these deficiencies that led to Red Robin's earning projections to be inaccurate.  Instead, Plaintiff alleges that other improper accounting practices, discussed below, led to the inaccurate

forecasts. (*See id.* ¶¶ 135–48.) Thus, it is unclear to this court how, by alleging Red Robin's knowledge of one specific kind of deficiency, that was not the cause of the incorrect earnings projections, Plaintiff expects to support a strong inference that Red Robin had actual knowledge of the deficiencies that allegedly led to the incorrect projections.

### (3)    *Improper Accounting Practices*

Plaintiff's Consolidated Complaint suggests that Red Robin had actual knowledge that its improper accounting practices would render its fourth quarter 2005 earnings forecasts inaccurate. (*See* Consolid. Compl. ¶¶ 22, 92–93, 103–18, 139.)  Specifically, Plaintiff alleges that: (1) although Red Robin assured investors that the Company closely monitored its workers' compensation liabilities, the Company was under-reserved for such liabilities by $750,000 when it computed its fourth quarter earnings guidance; (2) Red Robin knew it was undercounting supplies, because it used an accounting method in violation of Generally Accepted Accounting Principles ("GAAP"); (3) Red Robin failed to account for the impact of well-known increased petroleum prices; (4) Red Robin knowingly changed the Company's sales forecasting methods for new restaurants in new markets in computing its earnings guidance from methods the Company had previously used; (5) Red Robins knew restaurants opened in "greenfields areas" generated less sales than existing restaurants, yet the Company knowingly used sales forecasts from such existing restaurants for new greenfields restaurants when computing its earnings guidance; and (6) Red Robin knew it had no control system in place for its employee meal program, and it improperly accounted for costs relating to that system.  (*Id.*)  Viewing Plaintiff's allegations in the best possible light, Plaintiff essentially contends that because Red Robin relied on clearly improper accounting procedures, the Company must have known its accounting procedures: (1) were improper; and (2) would result in inaccurate earnings projections.  (*See id.*; Pl.'s Resp. at 48–50.) I find such allegations do not give rise to a strong inference that Red Robin possessed actual knowledge that its earnings projections were false.

28

In proving actual knowledge of corporate deficiencies, courts generally require direct evidence of knowledge or strong circumstantial evidence of willful blindness. *See, e.g.*, *Helwig*, 251 F.3d at 558 (finding actual knowledge of the likely negative impact of the Balanced Budget Act on the defendant-company because the allegations suggested such an impact was "obvious"); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999) ("Plaintiffs allege 'in your face facts' . . . that cry out, 'how could KPMG not have know that the financial statements were false.'").  In fact, this court's research reveals that most courts that have made a finding of actual knowledge have based that finding, in large part, on internal documents clearly laying out the corporate deficiencies about which the defendant is charged with having actual knowledge. *See, e.g.*, *Brody v. Stone & Webster, Inc. (In re Stone & Webster, Inc., Sec. Litig.)*, 414 F.3d 187, 210–11 (1st Cir. 2005) (finding actual knowledge of financial difficulties based on allegations that an accounts payable list showing accounts overdue by 600 to 700 days was prepared for company review on a regular basis, as well as regular distribution to the company's top executives of comprehensive internal financial reports showing the company's desperate situation); *No. 84 Employer-Teamster*, 320 F.3d at 941–42 (finding actual knowledge of maintenance problems based on allegations of: [1] several internal and external reports explicitly delineating the problems; [2] FAA letters relating the severity of the maintenance problems as well as penalties arising from investigations of the problems; and [3] charts documenting the maintenance problems). *But see Helwig*, 251 F.3d at 557–58 (finding actual knowledge of the deleterious impact of the Budget Act based on: [1] testimony before the Senate Finance

Committee of the likely impact of the Act; [2] statements by the Executive Vice President of "tough times coming;" and [3] evidence of insider trading).

In the instant action, Plaintiff does not allege the existence of a single written document showing that Red Robin was actually aware that it was utilizing improper accounting procedures that threatened the financial viability of the company; nor does Plaintiff allege sufficient facts to show that Red Robin's accounting failures were so obvious as to support an inference that the Company harbored an intent to artificially inflate its financial forecast. Although Plaintiff does allege that some of Red Robin's accounting errors were GAAP violations, such allegations are, standing alone, insufficient to show scienter. *PR Diamonds*, 364 F.3d at 684; *see also Fleming*, 264 F.3d at 1261. In fact, for the existence of the accounting failures themselves to be sufficient circumstantial proof of actual knowledge, the "magnitude," "pervasiveness," and "repetitiveness" of the company's violations of "simple" accounting principles must be significant. *PR Diamonds*, 364 F.3d at 684–5 (citing *In re MicroStrategy, Incorp. Secs. Litig.*, 115 F. Supp. 2d 620, 637 [E.D. Va. 2000] ["In this case, the alleged GAAP violations and the subsequent restatements are of such a great magnitude—amounting to night-and-day difference with regard to MicroStrategy's representations of profitability—as to compel an inference that fraud or recklessness was afoot."]). Plaintiff does not allege the accounting errors made by Red Robin were simple, or even uncommon, only that they were in error; nor does Plaintiff allege the errors were repetitive. (*See* Consolid. Compl.)

Further, the error of the greatest magnitude—accounting for approximately half of the miscalculation—involved an overly aggressive sales forecast for new restaurants. (Consolid.

Compl. ¶¶ 114–16.)  According to Plaintiff, the Company explained its miscalculation by stating

that it forecasted sales volume based upon an optimistic view reflecting the occurrence of the

previous three quarters of the year, which was—admittedly—pretty heavily weighted to existing

markets.  (*Id.* ¶ 116.)  Although Plaintiff seems to suggest this explanation was not true, it makes

no factual allegations to counter the explanation, save the fact that the accounting choice was in

error.  (*See id.*)  Put simply, "these are not the 'in your face facts' that 'cry out' scienter."  *PR*

*Diamonds*, 364 F.3d at 686 (quoting *Oxford Health*, F. Supp. 2d at 294).  Still, because the effect

of all of the errors resulted in a lowering of earnings forecasts by twenty percent, which is of

significant magnitude, I find that the accounting errors serve to create a weak inference of

scienter.

Based on the foregoing, and viewed under the totality of the circumstances, I find

Plaintiff's allegations fall far short of establishing a strong inference that Red Robin had actual

knowledge that its earnings forecasts were false and misleading when made.  *See Fleming*, 264

F.3d at 1262 ("Courts must look to the totality of the pleadings to determine whether the

plaintiff's allegations support a strong inference of fraudulent intent, or scienter, as required by

PSLRA.").  Thus, under the PSLRA's safe harbor provision, Red Robin's fourth quarter 2005

earnings forecasts are insulated from federal liability.  *See* 15 U.S.C. § 78u–5(c) (2006).

### b.      *Violation of Section 10(b) and Rule 10b–5*

Section 10(b) and Rule 10b–5 prohibit fraudulent acts committed in connection with

securities transactions.  Section 10(b) of the 1934 Act provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, . . .

31

(b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (2006).  Rule 10b–5, in turn, provides in part:

It shall be unlawful for any person, directly or indirectly,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (2006).  To state a claim under Rule 10b–5, a plaintiff must establish: (1) the defendant made a material misrepresentation or omission; (2) in connection with the purchase or sale of a security; (3) the defendant acted with scienter, that is, with the intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.  *Adams*, 340 F.3d at 1095 (citing *Grossman*, 120 F.3d at 1118).  No Defendants dispute that the alleged statements and omissions were made in connection with the purchase or sale of securities.  Further, where, as in the instant case, a claim is based on the "fraud on the market" theory, an investor's reliance on public material misrepresentation is presumed.  *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988).  Thus, in assessing the sufficiency of Plaintiff's complaint, this court focuses on whether Plaintiff adequately alleges that: (1) Red Robin made one or more misleading statements or omissions of material fact; and (2) the statements or omissions were made with the requisite scienter.

### *i.*    *Material Misrepresentations*

A statement or omission is material only if a reasonable investor would consider it important in determining whether to buy or sell stock. *Grossman*, 120 F.3d at 1119 (citations omitted). Whether the information is material depends on other information already available to the market; unless the statement or omission "'significantly altered the 'total mix' of information' available, it will be considered immaterial." *Id.* (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 [1976]).

The gravamen of Plaintiff's fraud claim is based on the following allegedly materially false and misleading statements or omissions: (1) during the Class Period, Red Robin repeatedly represented in public filings and press releases that management had evaluated the Company's disclosure procedures and financial reporting controls and found them to be effective, even though the Company twice disclosed that its procedures had been significantly deficient; (2) the Company's 2005 proxy, purportedly disclosing Snyder's annual compensation, excluded any mention of his usage of Red Robin's chartered jet; (3) the Board adopted a code of ethics, even though Snyder and McCloskey were actively violating several provisions of the Code; and (4) Red Robin failed to disclose information relating to material personnel changes. (Consolid. Compl. ¶¶ 119–48.) Red Robin argues these alleged misstatements and omissions are not material and, thus, cannot support an action for securities fraud, because: (1) alleged mismanagement is not actionable as securities fraud; (2) Plaintiff fails to show that any of Red Robin's statements regarding disclosure controls or the Code of Ethics were false or misleading when made; and (3) Snyder's undisclosed compensation and the failure of some executives to

follow the Code of Ethics are not a material omissions.  (*See* Red Robin Br. *passim.*; Red Robin

Reply *passim.*)  I address each of Red Robin's arguments below.

### (1)     Company Representations Regarding Disclosure Procedures and Internal Reporting Controls

Red Robin argues that its alleged misstatements or omissions regarding the Company's

deficient disclosure and financial reporting controls are insufficient to state a claim under federal

law, because Plaintiff has at best alleged corporate mismanagement.  (Red Robin Br. at 10–11.)

Plaintiff counters that although failure to report mismanagement alone may preclude a Section

10(b) claim, misstatements or omissions regarding the effectiveness of the Company's internal

controls are actionable.  (Pl.'s Resp. at 21–22.)

Nearly thirty years ago in *Santa Fe Industries v. Green*, 430 U.S. 462 (1977), the

Supreme Court held that the federal securities laws were not intended to create a federal remedy

for corporate misconduct traditionally left to state regulation, including "transactions which

constitute no more than internal corporate mismanagement" or breach of fiduciary duties.  *Id.* at

474–79.  Recognizing *Santa Fe*'s limitation on its ability to bring a claim based on

mismanagement alone, Plaintiff nonetheless argues *Santa Fe* does not bar its claims because in

*Santa Fe*, the plaintiffs did not allege that the defendants had made any misstatements or

omissions of material fact; whereas Plaintiff, in the instant action, has alleged several such

misstatements and omissions.  (Pl.'s Resp. at 21.)  Although Plaintiff's points are well taken,

Plaintiff fails to recognize the now clearly established rule that a plaintiff may not "bootstrap" a

claim for internal corporate mismanagement or breach of fiduciary duty by alleging that the

corporation or its directors failed to disclose that mismanagement or breach.  *See Field v. Trump*, 850 F.2d 938, 947 (2d Cir. 1988); *Kas v. Financial Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 287–89 (7th Cir. 1981), *cert. denied*, 454 U.S. 1092 (1981); *Bisenback v. Guenther*, 588 F.2d 400, 402 (3d cir. 1978); *In re United Telecomm. Inc., Sec. Litig.*, 781 F. Supp. 696, 699 (D. Kan. 1991).  In *Panter*, for instance, the Third Circuit observed that if "the central thrust of a claim or series of claims arises from acts of corporate mismanagement, the claims are not cognizable under federal law."  646 F.2d at 289.  "To hold otherwise," explained the court, "would be to eviscerate the obvious purpose of the *Santa Fe* decision, and to permit evasion of that decision by artful legal draftsmanship."  *Id.*; *see In re Craftmatic Sec. Litig.v. Kraftsow*, 890 F.2d 628, 638–39 (3d Cir. 1989) (stating "we must be alert to ensure that the purpose of *Santa Fe* is not undermined by 'artful legal draftsmanship'; claims essentially grounded on corporate mismanagement are not cognizable under federal law"); *United Telecomm.*, 781 F. Supp. at 699.

In the instant case, Plaintiff alleges that repeated representations in Red Robin's Form 10–Q's and press releases that management had evaluated the Company's disclosure and financial reporting controls and found them to be effective were false and misleading when made. (Consolid. Compl. *passim.*)  The crux of Plaintiff's argument is that even though there were numerous signals, as reported by confidential witnesses, of Red Robin's corporate deficiencies, Red Robin misstated that management had evaluated and approved the Company's disclosure procedures and internal reporting controls, and omitted to state that these systems were significantly deficient.  (*See id.*)  I find the "central thrust" of Plaintiff's allegations concerning

Red Robin's corporate deficiencies allege no more than corporate mismanagement and, thus, do not support a federal cause of action. *See Panter*, 646 F.2d 289; *United Telecommunications*, 781 F. Supp. at 699.

As Red Robin points out, Plaintiff fails to allege that Red Robin's certifications were actually untrue. (Red Robin Br. at 14.) Plaintiff does not aver that management did not actually evaluate the Company's internal controls and determine them to be effective. (*Id.*) Instead, implicit in Plaintiff's averments is that had management evaluated the Company's disclosure and financial reporting controls correctly, it would have or should have found them to be deficient—considering the widespread abuse. (*See* Consolid. Compl. ¶¶ 42–55, 119–24.) At base, this allegation is of mismanagement, which is not actionable under federal law.[9] *See Craftmatic*, 890 F.2d at 638. Further, any omission by Red Robin in disclosing its internal mismanagement is not actionable, because Plaintiff may not bootstrap his internal mismanagement claim into a federal securities action by alleging the disclosure philosophy of the statute obligates

---

[9]Additionally, it may be inferred from Plaintiff's averments that because Snyder was one of the members of management who found and certified Red Robin's internal reporting controls to be effective, and because it was he who was allegedly abusing weaknesses in the system, his certifications were implicitly misstatements. (*See* Consolid. Compl. ¶¶ 119–24.) At the outset, I note that Plaintiff nowhere avers that Snyder did not evaluate the system, which Snyder may have found effective in spite of the leeway it afforded him as CEO. Regardless, Plaintiff may not use "artful draftsmanship" to federalize "corporate conduct traditionally left to state regulation"—namely, Snyder's alleged breach of fiduciary duty. *Panter*, 646 F.2d at 288–89 (holding that "since a shareholder cannot recover under [Rule] 10b–5 for breach of fiduciary duty, neither can he 'bootstrap' such a claim into a federal securities action by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their activities, or their impure motives for entering the allegedly improper transaction").

Defendants to reveal their managerial deficiencies.  *See Atchley v. Quonaar Corp.*, 704 F.2d 335,

358 (7th Cir. 1983).  Based on the foregoing, I find Plaintiff's allegations regarding Red Robin's

corporate deficiencies do not support a federal cause of action.  *See Panter*, 646 F.2d 289; *United*

*Telecomm.*, 781 F.  Supp. at 699.

### *(2)   Undocumented "Compensation"*

Plaintiff's Consolidated Complaint suggests that Red Robin's third quarter Form 10–Q

and its 2005 proxy, which reviewed Snyder's annual compensation and excluded any mention of

his usage of Red Robin's chartered jet, was false and misleading, and included a material

omission.  (Consolid. Compl. ¶¶ 126–28.)  Item 402 of SEC Regulation S–K requires company

"disclosure of all plan and non-plan compensation awarded to, earned by or paid to" the CEO,

including "perquisites and other annual compensation not properly categorized as salary or bonus"

if the "aggregate amount of such compensation" is greater than $50,000.  17 C.F.R. § 229.402

(2006).  SEC regulations which mandate certain corporate disclosures are persuasive authority as

to the materiality of those disclosures.  *See, e.g., Fleming*, 264 F.3d at 1266 (relying on an SEC

disclosure regulation as a "guidepost" for the court's materiality determination).  Plaintiff alleges

that under Item 402: (1) Snyder's improper travel expenses amounted to in excess of $50,000; (2)

the proxy statement materially misrepresents or omits this fact; and (3) such an omission is per se

material.  (Consolid Compl. ¶¶ 126–28; Pl.'s Resp. at 32–34.)  Red Robin argues it had no duty

to disclose the expenses at issue as compensation, because central to Plaintiff's Consolidated

Complaint is that, as a result of poor internal controls, Snyder received certain expense

reimbursements he should not have received.   (Red Robin Br. at 23.)  Moreover, argues Red

Robin, the fact that Snyder ultimately agreed to pay the money back shows the aircraft usage was

not "compensation." (*Id.*) Plaintiff, relying largely on *In re Tyco Internat'l, Ltd.*, MDL No.

02–1335–B, 2004 U.S. Dist. LEXIS 20733 (D. N.H. Oct. 14, 2004), counters that even if the

"payments" to Snyder were not authorized, Red Robin was nevertheless required to disclose

those benefits as compensation. (Pl.'s Resp. at 32–34.)

Cases interpreting the requirements of 17 C.F.R. § 229.402 deal almost exclusively with

money or benefits that were knowingly given to executives by the company, not improperly taken

from the company in violation of company policy. *See, e.g.*, *Seinfeld v. Bartz*, 322 F.3d 693 (9th

Cir. 2003) (analyzing a company's failure to disclose a certain valuation of the options knowingly

and intentionally granted by the company to non-employee directors). In *Tyco*, however, a New

Hampshire district court, in an unpublished opinion, determined that Tyco's failure to disclose

millions of dollars looted by company executives violated 17 C.F.R. § 229.404, in spite of the fact

that the Tyco Board of Directors was unaware of the violations. 2004 U.S. Dist LEXIS 20733,

at * 6–7. The district court based its determination on the fact that the case did not involve

"routine theft by a low-ranking employee, which obviously would not be covered by Item[] 402,"

but instead charged that senior executives authorized and participated in "the looting as

compensation for participation in a larger scheme to artificially inflate the price of Tyco's stock."

*Id.* In the instant case, the improper usage of a chartered aircraft by Snyder, a senior executive,

neither involves a routine theft by a low-ranking employee *nor* a scheme to artificially affect

market activity. Instead, taking all of Plaintiff's allegations as true, it involves a senior executive

taking advantage of weak internal controls for his own personal gain.  (*See* Consolid. Compl. *passim.*)  Thus, *Tyco* is not on point.

Regardless, I find the plain language of 17 C.F.R. § 229.402 does not contemplate the disclosure of "compensation" taken from a company, but is limited to compensation "awarded to, earned by, or paid to" certain executive officials.  Clearly, in this case, the aircraft usage was not "awarded to, earned by, or paid to" Snyder, as—once such usage was discovered—Snyder was required to reimburse the Company for his undocumented expenses.  (*See* Consolid. Compl. ¶ 60.)  Thus, I find 17 C.F.R. § 229.402 imposes no duty to disclose improperly taken executive "compensation."

This court notes, however, that "[i]t is possible for securities fraud defendants to comply technically with SEC reporting requirements . . . and yet still be omitting information that is material and should therefore be disclosed."  *Fleming*, 264 F.3d at 1267.  Under the PSLRA, however, to plead a valid Rule 10b–5 claim, a plaintiff must plead with particularity the facts surrounding the alleged fraud, including identifying the specific misleading statements or omissions and the reasons why they are misleading.  15 U.S.C. § 78u–4(b)(1)–(2) (2006).  Here, the only misleading statement Plaintiff points to concerning Snyder's compensation is Red Robin's third quarter Form 10–Q and 2005 proxy, and the only reason Plaintiff suggests the statements are misleading is because SEC regulations impose a duty to disclose.  (*See* Consolid. Compl. ¶¶ 128.)  Accordingly, I find Plaintiff's allegations regarding any omission of Snyder's improper "compensation" do not support a federal cause of action.

### (3)   *The Code of Ethics*

Plaintiff's Consolidated Complaint alleges that the Board's announcement of its adoption of a code of ethics in its third quarter 2004 Form 10–Q was false and misleading, because the Company failed to reveal ongoing significant breaches of the Code by McCloskey and Snyder. (Consolid. Compl. ¶ 124.)  Red Robin argues any omission in its announcement was not material because: (1) given that federal securities regulations create a presumption that a public company will have a code of ethics and that NASDAQ requires a code of conduct, the notion that Red Robin's adoption of such a code "significantly altered" the "total mix of information available to investors" is unsupportable; (2) finding the adoption false and misleading would create a disincentive to companies to implement codes of ethics as well as investigate and report possible violations and; (3) because the Code of Ethics essentially reaffirms state law fiduciary duties of the Company's officers, adoption of such an ethics policy could turn any violation into a securities fraud.  (Red Robin Br. at 27–28 [quoting *TSC Indus.*, 426 U.S. at 449.)  Plaintiff counters that "[i]t is inconceivable that an investor would not find it important that a company adopting a code of ethics was at the same time violating it."  (Pl.'s Resp. at 35.)

Here, Plaintiff does not argue that the Board's adoption of the Code of Ethics was false and misleading, but, instead, that its omission of violations of that Code was false and misleading. I disagree.   Under SEC regulations, a company must post a code of ethics on its website, and a company that has not adopted a code of ethics applicable to its principal officers must publicly disclose why it has not done so.  17 C.F.R. § 229.406(a)–(b) (2006).  Further, NASDAQ rules require its members adopt a code of conduct applicable to all officers and directors.  *See*

NASDAQ, Inc., Rule 4350(n) (Dec. 13, 2006), *available at*

http://nasdaq.complinet.com/nasdaq/display/display.html?rbid=1705&element_id=18. A

company's essentially mandatory adoption of a code of ethics simply does not imply that all of its

directors and officers are following that code of ethics. In fact, the mandatory nature of the

adoption of such a code makes clear that all public companies—whether run by crooks or

angels—will adopt just such a code. *See* 17 C.F.R. § 229.406(a)–(b) (2006.) Further, a code of

ethics is inherently aspirational; it simply cannot be that every time a violation of that code occurs,

a company is liable under federal law for having chosen to adopt the code at all, particularly when

the adoption of such a code is effectively mandatory. *See id.* That being said, if Snyder and

McCloskey's alleged violations of the Code amount to a breach of fiduciary duty, Plaintiff is not

without recourse in state law. Based on the foregoing, I find that Red Robin's omission of the

fact that some of its officers were violating the Company's newly adopted Code of Ethics from

the announcements of the adoption of that Code does not, under the circumstances, render the

statement of adoption misleading; therefore, the omission cannot support a claim of securities

fraud. *See* 17 C.F.R. § 240.10b–5 (2006)

### (4)    Personnel Changes

Plaintiff alleges in its Consolidated Complaint that Red Robin's June 22, 2005 announcement of Sherping's replacement of McCloskey as CFO was materially false and misleading, because the Company failed to state the reason for McCloskey's departure, which Plaintiff alleges was the CFO's non-compliance with the Company's aircraft usage, travel, and entertainment expense policies. (Consolid. Compl. ¶ 131.) Red Robin argues that Plaintiff fails to allege sufficient facts to support an inference that McCloskey's replacement was connected with an internal investigation. (Red Robin Br. at 28.) Plaintiff counters that the following facts support this inference: (1) Red Robin's August 11, 2005 press release and its second quarter 2005 Form 10–Q stated that the Company's recent management changes followed an internal investigation relating to improper expensing; and (2) Red Robin's second quarter 2005 Form 10–Q stated that the replacement of McCloskey "will strengthen [the Company's] controls related to financial reporting." (Pl.'s Resp. at 37–38 [citing Consolid. Compl. ¶¶ 62, 74, 131].)

Assuming Plaintiff alleges sufficient facts to support an inference that McCloskey's replacement was linked to non-compliance with Company aircraft use and travel and entertainment expense policies, I find any such omission was immaterial. SEC regulations mandate that public companies disclose the fact of and the date of an officer's replacement; however, the company need not disclose the reason for an officer's replacement.[10]  *See* 71 Fed.[10]

---

[10]Plaintiff states in its brief that Red Robin's disclosure of McCloskey's replacement was not timely under Item 5.02 of Form 8K, which requires disclosure within four days of a triggering event. *See* 69 Fed. Reg. 15594, 15595 (Mar. 25, 2004.) Plaintiff's averment confounds the court considering that, according to the Consolidated Complaint, Red Robin's disclosure occurred two

Reg. 53158, 53195 (Sept. 8, 2006).  One rationale behind the SEC's decision not to require

disclosure of the reason for an officer's replacement was that "requiring disclosure of a

disagreement regarding matters such as company policy or strategy between two officers would

usurp the typical corporate decision-making process."  69 Fed. Reg. 15594, 15605 (Mar. 25,

2004).  It is the degree of the failure or wrongdoing behind the replacement that could serve to

convert a protected corporate decision into a material omission.  In this case, Plaintiff fails to

allege Red Robin's knowledge of a sufficiently significant corporate failure to constitute a material

omission.

   Prior to August of 2005, Plaintiff alleges Red Robin: (1) examined its books and found

expenses Synder could not adequately document; and (2) hired a law firm to investigate these

undocumented expenses.  (*Id.* ¶¶ 57, 59.)  Red Robin was not presented with the findings of this

investigation until August 8, 2005, immediately after which the Board took action against

McCloskey and Snyder.  (*Id.* ¶¶ 59–61.)  According to this proffered chronology, it appears that

in June of 2005, when Red Robin replaced McCloskey as CFO, the Company was in an early

stage of investigation and did not yet know the extent of the significant corporate deficiencies

ultimately revealed in August of 2005.  (*See id.*)  This inference is strongly supported by

Plaintiff's allegation that McCloskey was permitted to stay on as Vice President until August 10,

2005, two days after the Board was informed of the breadth and depth of its corporate

---

days after McCloskey was replaced.  (*See* Consolid. Compl. ¶ 131.)

deficiencies.  (*Id.* ¶ 29.)  Absent an allegation of a some known and markedly significant wrongdoing by McCloskey that led to his replacement as CFO in June 2002, I cannot find that an omission of the reasons for his replacement—that some undocumented travel expenses occurred under his watch—would be "important" to a "reasonable investor" in her decision of whether to buy or sell Red Robin stock.  *See Grossman*, 120 F.3d at 1119; *cf. Fleming*, 264 F.3d at 1266 (finding that although certain corporate litigation involved a high enough damage claim to merit mandatory disclosure, plaintiff failed to allege sufficient facts to support a finding that at the particular time at issue, defendants were aware of the extent of the potential damage claim).

Plaintiff next alleges in its Consolidated Complaint that the termination of Dahl as Controller was not properly reported under Item 5.02(b) of Form 8–K, because, although Dahl was terminated sometime during the second quarter of 2005, her termination was not disclosed until August 19, 2005.  (Consolid. Compl. ¶ 132.)  Red Robin argues its disclosure of Dahl's termination was not required, because Item 5.02(b) mandates only prompt disclosure of the termination of its "'principal executive officer, president, principal financial officer, principal accounting officer, principal operating officer or any person performing similar functions'—i.e., persons serving in 'principal capacities.'" (Red Robin Reply at 27 [quoting 69 Fed. Reg. 15994, 15605 (Mar. 25, 2004)].)  Dahl, claims Red Robin, was not a person serving in such a capacity. (*Id.*)  Plaintiff does not directly contradict this argument.  I find Red Robin's argument persuasive. Plaintiff alleges that Dahl, as Controller, reported to McCloskey, as CFO.  (Consolid. Compl. ¶ 54.)  As such, Dahl was not serving in a principal "capacity," and, thus, her termination need not have been disclosed under Item 5.02(b).

Still, I must determine whether failure to disclose Dahl's termination was material.  *See Fleming*, 264 F.3d at 1267.  Plaintiff alleges the contemporaneousness of Dahl's termination with the Company's internal investigation supports an inference that the events were connected, and points to Red Robin's statement in its Form 10–Q that Dahl's departure "will strengthen [the] Company's controls related to financial reporting."  (Consolid. Compl. ¶¶ 75.)  Red Robin argues Plaintiff's allegations are insufficient to support the intended inference.  Presuming, for the purposes of this motion, that Plaintiff successfully alleges such a connection, I find, as with the allegations concerning McCloskey's replacement, that Plaintiff fails to allege that Red Robin terminated Dahl based on knowledge of significant failures for which Dahl was responsible.  To the contrary, Plaintiff's allegations strongly suggest that Red Robin did not become aware of the significance of its corporate deficiencies until August 8, 2005, at which point Red Robin took immediate and decisive action.  (*See* Consolid. Compl. ¶¶ 59–60.)  Accordingly, I find Plaintiff fails to allege sufficient facts to support a finding that had Red Robin disclosed the reasons for Dahl's termination—that some undocumented travel expenses occurred under her watch—a "reasonable investor" would have considered the disclosure important in her decision of whether to buy or sell Red Robin stock.  *See Grossman*, 120 F.3d at 1119.

Plaintiff's Consolidated Complaint alleges that Graebel was removed from the Audit Committee between April 22, 2005 and November 11, 2005; yet his removal was not disclosed until November 17, 2005, rendering the disclosure untimely.  (Consolid. Compl. ¶¶ 81–85, 132.)  Defendant argues that under Item 5.02(a), the changes in the composition of a board committee need not be disclosed.  (Red Robin Reply at 28.)  Item 5.02(a) requires disclosure if "a director

45

has resigned or refuses to stand for re-election to the board of directors." 71 Fed. Reg. 53158,

53195 (Sept. 6, 2006). Here, Plaintiff does not allege that Graebel resigned as a director or

refused to stand for re-election, only that he was removed from a board committee; thus, Red

Robin had no duty to disclose Graebel's removal under Item 5.02(a).[11] *See id.* Accordingly, I

find Plaintiff alleges insufficient facts to show Red Robin's failure to report Graebel's departure

from the Audit Committee was improper. Based on the foregoing, I find Red Robin's failure to

disclose information relating to personnel changes are immaterial and thus do not support a

federal cause of action.

### (5)     *Totality of the Circumstances*

This court recognizes that when evaluating a motion to dismiss under Rule 12(b)(6), "the

district court must evaluate 'the totality of the pleadings' to determine if the plaintiff[ has] stated

an actionable claim of securities fraud." *Adams*, 340 F.3d at 1092 (quoting *Fleming*, 264 F.3d at

1261–62). That I analyze each of Plaintiff's allegations separately in this order does not mean

that I do not also consider them in aggregate. Considered in totality, Plaintiff's allegations

strongly suggest that Red Robin fell victim to corporate mismanagement that, when discovered,

led to an instantaneous and publicly announced change of the guard. With that change came a

significant miscalculation of future profits, which Red Robin also publicly announced immediately

---

[11]Although Plaintiff seems to argue in its response brief that Graebel's removal was material, regardless of the SEC disclosure requirements, no such allegation is fairly attributable to the Consolidated Complaint, where Plaintiff limits itself to alleging untimeliness of the disclosure. (*See* Consolid. Compl. ¶ 133.) In a motion for dismissal, I am constrained to consider the allegations in Plaintiff's complaint, not its arguments newly raised in response to a dispositive motion. *See Dubbs*, 336 F.3d at 1201.

upon discovery.  Plaintiff fails to successfully allege with particularity a single false and misleading material statement or omission; thus, Plaintiff fails to state a claim for securities fraud under Section 10(b) of the 1934 Act.  *See* 15 U.S.C. § 78u–4(b)(1) (2006).

### c.    *Plaintiff's Claims Under Section 14(a)*

Plaintiff alleges Red Robin violated Section 14(a) of the 1934 Act, as well as Rules 14a–3 and 14a–9 thereunder, by failing to disclose Snyder's undocumented expenses in Red Robin's proxy statements for fiscal years 2004 to 2005.  (Consolid. Comp. ¶¶ 184–87.)  Rule 14a–9 prohibits, in relevant part, the use of proxy statements which omit any material fact so as to make the statements false or misleading.  17 C.F.R. § 240.14a–9 (2006).  Importantly, to prevail under Section 14(a), a plaintiff must show, among other things, that "a proxy statement contained a material misrepresentation or omission."  *Cathcart*, 980 F.2d at 932.  Plaintiff's claim necessarily must fail, because I have already determined that Plaintiff does not plead sufficient facts to support a finding that Red Robin's omission of Snyder's undocumented expenses was material. (*See Analysis* § 2(b)(i)(2), *supra.*)

### d.    *Plaintiff's Claims Under Section 20(a)*

To state a prima facie claim of control person liability under Section 20(a) of the 1934 Act, Plaintiff must establish: (1) a primary violation of the securities laws; and (2) control over the primary violator by the alleged controlling person.  *Fleming*, 264 F.3d at 1270–71.  Because I have already dismissed Plaintiff's claims relating to all primary violations of the 1934 Act, Plaintiff's controlling person liability claims must be dismissed as well.  *Id.* at 1271.

*3.*     *Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.      Defendant McCloskey's motion to dismiss (#108) is GRANTED.

2.      Defendants Mullen, Dahl, Scherping, and Red Robin's motion to dismiss (#109) is

GRANTED.

3.      Defendant Snyder's motion to dismiss (#110) is GRANTED.

The clerk shall forthwith enter judgment in favor of Defendant and against

Plaintiff, dismissing Plaintiff's claims with prejudice.  Defendant may have its costs by filing a bill

of costs within eleven days of the date of this order.

Dated this 2nd day of January, 2007.

                                          BY THE COURT:


                                          s/ Edward W. Nottingham
                                          EDWARD W. NOTTINGHAM
                                          United States District Judge